**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE MARK A. BARNETT, JUDGE**

| | | |
|---|---|---|
| THE CHEMOURS COMPANY FC, LLC,<br>*Plaintiff*,<br><br>v.<br><br>U.S. INTERNATIONAL TRADE COMMISSION,<br>*Defendant*,<br><br>AND<br><br>AGC CHEMICALS AMERICA; THE PTFE PROCESSORS ALLIANCE; ZHEJIANG JUSHENG FLUOROCHEMICAL CO., LTD.; SHANDONG DONGYUE POLYMER MATERIAL CO., LTD.; SHANGHAI HUAYI 3 F NEW MATERIALS SALES CO., LTD.; ZHONGHAO CHENGUANG RESEARCH INSTITUTE OF CHEMICAL INDUSTRY CO., LTD.; JIANGXI LEE & MAN CHEMICAL LTD.; JIANGSU MEILAN CHEMICAL CO., LTD.; AND CHINA CHAMBER OF COMMERCE OF METALS, MINERALS & CHEMICAL IMPORTERS,<br>*Defendant-Intervenors*. | ) | Consol. Ct. No. 18-00174 |

**ORDER**

On March 8, 2019, Plaintiff, The Chemours Company FC, LLC ("Chemours"), moved to supplement and amend the administrative record in the investigations by the U.S. International Trade Commission (the "Commission") of *Polytetrafluoroethylene Resin from China and India*, Inv. Nos. 701-TA-588 and 731-TA-1392-93 (Final), underlying the instant action to include information impugning the veracity of the foreign producer questionnaires submitted by Gujarat Fluorochemicals Limited ("GFL"), a foreign producer and exporter of the subject merchandise (polytetrafluoroethylene resin or PTFE resin) from India. Chemours also sought leave to amend its complaints to reflect fraud claims. In that motion, Chemours further requested that this Court

remand the underlying proceeding to the Commission for reconsideration of its final determinations in the antidumping and countervailing duty investigations in light of the additional information. Upon consideration of Chemours' motion, it is hereby

ORDERED that Chemours' March 8, 2019 motion is granted, and it is further

ORDERED that the materials appended to that motion shall be included in the administrative record of the Commission's proceedings in *PTFE Resin from China and India*, Inv. Nos. 701-TA-588 and 731-TA-1392-1993 (Final) and referenced as Public Documents 130, 131, 132, 133, and 134 and Confidential Document 322. It is further

ORDERED that Chemours' request to amend its Complaints, ECF No. 8 (Sept. 7, 2018) in Consol. Ct. No. 18-00174 and ECF No. 8 (Jan. 30, 2019) in Ct. No. 19-00001, to reflect its fraud claims, is granted, and it is further

ORDERED that the Amended Consolidated Complaint filed on March 8, 2019 is hereby accepted for filing in the captioned consolidated action. It is further

ORDERED that this matter is remanded to the Commission for reconsideration of its final determinations in the antidumping and countervailing duty investigations of PTFE from China and India in light of the additional information.

Dated: ______________________________, 2019
New York, NY

______________________________
Hon. Mark A. Barnett

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE MARK A. BARNETT, JUDGE**

THE CHEMOURS COMPANY FC, LLC,
*Plaintiff,*

v.

U.S. INTERNATIONAL TRADE COMMISSION,
*Defendant,*

AND

AGC CHEMICALS AMERICA; THE PTFE PROCESSORS ALLIANCE; ZHEJIANG JUSHENG FLUOROCHEMICAL CO., LTD.; SHANDONG DONGYUE POLYMER MATERIAL CO., LTD.; SHANGHAI HUAYI 3 F NEW MATERIALS SALES CO., LTD.; ZHONGHAO CHENGUANG RESEARCH INSTITUTE OF CHEMICAL INDUSTRY CO., LTD.; JIANGXI LEE & MAN CHEMICAL LTD.; JIANGSU MEILAN CHEMICAL CO., LTD.; AND CHINA CHAMBER OF COMMERCE OF METALS, MINERALS & CHEMICAL IMPORTERS,
*Defendant-Intervenors.*

Consol. Ct. No. 18-00174

**PUBLIC VERSION**

Business Proprietary Information Subject to Protective Order Is Removed from Brackets on Pages 5-10, 12, 13, List of Appendices, Appendix 3, and Appendix 7

**MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, TO AMEND THE COMPLAINTS, AND TO REMAND THE CASE TO THE AGENCY**

Plaintiff, The Chemours Company FC, LLC ("Chemours"), respectfully requests to supplement and amend the administrative record to include information impugning the veracity of the foreign producer questionnaires submitted by Gujarat Fluorochemicals Limited ("GFL"), a foreign producer and exporter of the subject merchandise (polytetrafluoroethylene resin or PTFE) from India,[1] in the investigations by the U.S. International Trade Commission (the "Commission") of *Polytetrafluoroethylene ("PTFE") Resin from China and India*, Inv. Nos.

[1] Defendant-Intervenor GFL withdrew from this action on February 15, 2019. *See* Notice of Dismissal of Defendant-Intervenor, ECF No. 46 (Feb. 15, 2019).

701-TA-588 and 731-TA-1392-93 (Final), underlying this action.[2] Chemours further seeks leave to amend its Complaints to reflect these fraud claims. Moreover, because the fraudulent foreign producer questionnaires were material to the Commission's negative determinations regarding imports of PTFE from China and India, which the Commission cumulated, Chemours further moves to remand the challenged final determinations in the antidumping and countervailing duty investigations of PTFE from China and India for the Commission's reconsideration in light of the newly discovered information.

Although the record for judicial review ordinarily consists only of documents "presented to or obtained by" the Commission during the administrative proceeding,[3] there are well-established exceptions to this rule, including in circumstances where the underlying

---

[2] The Commission's determination regarding subsidized imports of PTFE from India was published in the *Federal Register* on July 11, 2018. *See Polytetrafluoroethylene Resin from India*, 83 Fed. Reg. 32,150 (Int'l Tr. Comm'n Jul. 11, 2018) (final det.), Public List Document Number ("PL") 124. This determination and the related public views of the Commission are contained in *Polytetrafluoroethylene Resin from India and China*, Inv. Nos. 701-TA-588 and 731-TA-1392-1393 (Final), USITC Pub. 4801 (Jul. 2018) ("ITC Final"), PL127. The Commission's determinations regarding the less-than-fair-value imports of PTFE from China and India were published on December 4, 2018. *See Polytetrafluoroethylene (PTFE) Resin from China and India; Determination*, 83 Fed. Reg. 62,603 (Int'l Tr. Comm'n Dec. 4, 2018) (final det.). These determinations and the related public views of the Commission are contained in *Polytetrafluoroethylene Resin from China and India*, Inv. Nos. 731-TA-1392-1393 (Final), USITC Pub. 4841 (Nov. 2018).

[3] *See* 19 U.S.C. § 1516a(b)(2)(A) (defining the record for judicial review); 19 C.F.R. §§ 207.2(f), 207.4 (defining the Commission's record). Consistent with the Commission's usual practice and with Rule 73.2(b) of the Rules of the U.S. Court of International Trade ("CIT"), the Commission submitted a list of the documents on the administrative record to the Court. Under the *Beker* rule, the scope of the record for purposes of judicial review ordinarily would be limited to the documents identified in the record list, that "is based upon information which was 'before the relevant decision-maker' and was presented and considered 'at the time the decision was rendered.'"). *Beker Indus. Corp. v. United States*, 7 C.I.T. 313, 315 (1984) (quoting S. Rep. No. 96-249 at 247–48 (1979)); *see also Nucor Corp. v. United States*, 28 C.I.T. 188, 229, 318 F. Supp. 2d 1207, 1244 (2004) (applying *Beker* to the Commission); *Kerr-McGee Chemical Corp. v. United States*, 21 C.I.T. 1179, 1183, 985 F. Supp. 1162, 1165 (1997) (as a general rule, the administrative record may not be expanded to include documents that were never submitted to the agency).

administrative proceedings were tainted by fraud.[4] We therefore request this Court to order the Commission to reconsider its decision in light of information that was not included in the original administrative record but that reasonably indicates that the certified questionnaire responses filed by GFL misstated material facts.[5]

Indeed, as the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") explained in *Home Products International, Inc. v. United States*, 633 F.3d. 1369, 1378 (Fed. Cir. 2011), where, as here, "a party brings to light clear and convincing new evidence sufficient to make a *prima facie* case that the agency proceedings under review were tainted by material fraud," the CIT would abuse its discretion if it were to decline to order a remand to require the agency to reconsider its decision in light of the new evidence. Both the Federal Circuit and the CIT also have confirmed that administrative agencies have the authority to reconsider their decisions in light of such new information (as well as the authority to reopen a proceeding to include later-discovered evidence of fraud in the original record, if the original proceedings are not then undergoing judicial review).[6]

---

[4] *See generally Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277 (Fed. Cir. 2012) (acknowledging that the courts "have carved out a small number of exceptions when we allow supplementation of the agency record" such as when the original record was tainted by fraud).

[5] *See generally Borlem S.A. Empreedimentos Industriais v. United States*, 913 F.3d 933, 939 (Fed. Cir. 1990) ("Where such intervening events are properly brought to the attention of the reviewing court, that court may rely on that occurrence and typically will remand for consideration by the decisionmaker.").

[6] *See, e.g.*, *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360–61 (Fed. Cir. 2008) (concluding that administrative agencies have the authority to reopen a proceeding to include later-discovered evidence of fraud in the original proceedings); *Consol. Fibers Inc. v. United States*, 30 C.I.T. 1820, 1826, 465 F. Supp. 2d 1338, 1343 (2006) (recognizing the Commission's "inherent administrative authority under the antidumping and countervailing duty laws to reconsider its original injury determinations, at least when fraud has been perpetrated on the agency during the underlying investigations") (citing *Elkem Metals Co. v. United States*, 26 C.I.T. 234, 240, 193 F. Supp. 2d 1314, 1321 (in turn citing *Borlem*, 913 F.2d at 938–39, for the proposition that the CIT "has the authority to order the ITC, on remand, to reconsider a prior

As explained below, Chemours seeks to include information appended to this motion in the underlying administrative record and to amend its Complaints to reflect its claims of fraud by GFL. Since the appended information described herein constitutes clear and convincing new evidence sufficient to make a *prima facie* case that the agency proceedings under review were tainted by material fraud, Chemours also respectfully requests that the Court remand the Commission's negative determinations for reconsideration of the new information.

A. The Fraudulent Foreign Producer Questionnaires Submitted by GFL Were Material to the Commission's Negative Final Determinations

When analyzing the threat of material injury by reason of cumulated imports of PTFE from China and India,[7] the Commission predicated its negative determinations on questionnaire data reported by foreign producers in China and India.[8] For India, the Commission relied on questionnaire data and projections reported by GFL, the sole responding foreign producer and

---

determination" and that "courts have explicitly found the ITC to have the authority to reconsider its final determinations")).

[7] Confidential India CVD Views, corresponding on the record list submitted by the Commission to Confidential Document Number ("CL") 321 at 57 (cumulating PTFE imports from China and India).

[8] Confidential India CVD Views, CL321 at 4-5. As reflected in Chemours' Complaints, the Commission's analysis of material injury and threat of material injury incorrectly assumed that the statute requires a significant increase in cumulated subject imports, and its findings of no such increase or likely increase were not supported by substantial record evidence. *See* Complaint, Ct. No. 18-00174, ECF Doc. 8 at ¶¶ 14–32, 36–39, 41, 43, 47, 49 and Complaint, Ct. No. 19-00001, ECF Doc. 8 at ¶¶ 14-37, 41-44, 46, 48, 52, 54, 56. The Commission's determinations also were internally inconsistent in their treatment of processors, certain of which the Commission included in the domestic industry despite their primary interest as importers rather than domestic producers, while also blaming the domestic industry for their imports. *See* Complaint, Ct. No. 18-00174, ECF Doc. 8 at ¶¶ 11–13, 34 and Complaint Ct. No. 19-00001, ECF Doc. 8 at ¶¶ 11-13, 39. Its negative determinations also were legally flawed and unsupported by the record for other reasons. *See, e.g.*, Complaint, Ct. No. 18-00174, ECF Doc. 8 at ¶¶ 36, 41, 45, 47 and Complaint, Ct. No. 19-00001, ECF Doc. 8 at ¶¶ 39, 46, 50, 52.

exporter of subject merchandise from India, on its PTFE operations there.[9] Relying on these data, the Commission found that –

- "Nothing in the record indicates that there is likely to be any change in conditions of competition in the imminent future that will likely cause a deviation from the patterns observed during the POI: that subject imports increased only when demand did, and that subject import market share increases did not reduce the market share of the domestic industry."[10]

- "The record indicates that the capacity of the subject industries is high both absolutely and relative to apparent U.S. consumption. It also indicates appreciable quantities of excess capacity held by the subject industries, although capacity utilization was rising during the POI and is projected to increase further. Nevertheless, notwithstanding the existence of excess capacity throughout the POI, responding subject producers' export shipments to the United States increased only from 2016 to 2017, when U.S. demand rose."[11]

- "Subject producers' capacity was [ ] {pounds} in 2015, [ ] {pounds} in 2016, and [ ] {pounds} in 2017. CR/PR at Table VII-8. Subject producers' projected capacity for 2018 and 2019 is below the 2017 level."[12]

- "Therefore, even if there is some increase in the volume of cumulated subject imports entering the U.S. market in the imminent future, the record indicates no likely imminent change in conditions of competition which would likely change the lack of causal relationship between significant volumes of low-priced subject imports and prices of the domestic like product observed during the POI."[13]

- "In light of our findings that there is not likely to be a significant increase in subject import volume during the imminent future that will result in any decline in the domestic industry's market share and that subject imports will not likely have

---

[9] USITC Pub. 4801 at 4.

[10] Confidential India CVD Views, CL321 at 58.

[11] Confidential India CVD Views, CL321 at 59 (omitting footnotes 281 and 282). In footnote 282, the Commission noted that "{s}ubject producers' capacity utilization was [ ] percent in 2015, [ ] percent in 2016, and [ ] percent in 2017. Subject producer capacity utilization is forecast to increase to [ ] percent in 2018 and [ ] percent in 2019."). Confidential India CVD Views, CL321 at 59 n.282; USITC Pub. 4801, at 38 n.282.

[12] Confidential India CVD Views, CL321 at 59 n.281 (emphasis added) (units of measurement corrected to reflect Confidential Posthearing Report, CL285 at VII-14, Table VII-8, the source for the sentence).

[13] Confidential India CVD Views, CL321 at 61.

> significant price effects, the record does not indicate a probability that material injury by reason of the subject imports is imminent."[14]

Information discovered in the intervening time since the Commission's determinations indicates that GFL failed to report significant changes in its operations [ ] that would have altered the outcome of the case. First, GFL [ ].[15] However, GFL withheld information that it was already in the process of expanding its production capacity for TFE, even at the time that it filed its questionnaire response in April 2018.

Second, GFL [ ].[16] However, GFL failed to disclose projections made during investor calls and notifications filed with Indian regulatory authorities stating that it would be producing at considerably higher levels as of 2018, due to TFE debottlenecking and expansion of PTFE capacity, as discussed below. [

---

[14] Confidential India CVD Views, CL321 at 62.

[15] *See* GFL's Foreign Producer Questionnaire (Prelim.), CL48 (EDIS Doc. 625719) (Oct. 12, 2017) (hereinafter "GFL's Questionnaire (Prelim.)"); GFL's Foreign Producer Questionnaire (Final), CL190 (EDIS Doc. 643270) (Apr. 25, 2018) at [ ] (hereinafter "GFL's Questionnaire (Final)") (GFL identifying [ ]).

[16] *See* GFL's Questionnaire (Prelim.), *supra* n.15, CL48 at [ ].

].[17]

Third, GFL's foreign producer questionnaire also [ ].

The deliberate [ ] and the omission of any reference to or explanation regarding [ ] were material. Had the Commission known these facts, it would not have found that subject producers' projected capacity for 2018 and 2019 was lower than for 2017, that subject imports' rising capacity utilization would reach [ ] percent in 2018 and [ ] percent in 2019, or that nothing in the record indicated a likely change in conditions of competition in the imminent future that would cause a deviation from the patterns observed during the POI – findings that formed the basis for its negative determinations regarding the volume, price effects, and impact of subject imports in the imminent future. Consequently, the fraudulent foreign producer questionnaires were material to the Commission's negative determinations.

B. The Appended Information Provides Clear and Convincing Evidence that GFL Submitted Fraudulent Foreign Producer Questionnaires to the Commission

GFL's capacity expansions did not emerge overnight. They were part of a strategic expansion of GFL's fluoropolymer business, undertaken in response to a long-term decline in its exports of traditional refrigerants,[18] and were underway at the time that GFL prepared and

---

[17] *See* GFL's Questionnaire (Prelim.), *supra* n.15, CL48 at [ ]; GFL's Questionnaire (Final), CL190 at [ ] (simply noting that [ ]).

[18] *See* Environmental Impact Assessment Report, App'x 2 (Mar. 2018) at Executive Summary at 1 ("With the implementation of the phase out plan as per the Montreal Protocol globally, the export market for the refrigerant use has seen steady decline since 2010. Also, with the phase out of HCFC-22 in the developed countries, there is a shift to the usage of HFC-32 for

submitted its October 12, 2017 and April 25, 2018 foreign producer questionnaire responses to the Commission, as shown in the appendix to this motion.

For example, according to corporate intelligence [

], GFL had PTFE capacity of [ ] MT in 2017.[19] [

].[20] According to [ ], GFL invested [

].[21]

By the time of a February 8, 2018 quarterly conference call with investors, Managing Director Vivek Jain confirmed that GFL was in the midst of an investment project to debottleneck its TFE production process and expand its capacity.[22] Managing Director Jain and V.K. Soni, Head of Projects & New Initiatives, reported that GFL's two monomer plants had current total capacity of "about 50 tons per day which will go to about 90-95 tons per day" by

---

refrigeration. Due to this fact, GFL has decided to (i) manufacture new products including new age refrigerant gas HFC-32 and related products (ii) increase the production capacity of Fluoropolymers including Poly Tetrafluoro Ethylene (PTFE)."); *id.* at 1.1 (same).

[19] *See* [

].

[20] *See* [ ]. [

]. *See* [ ].

[21] *See* [ ].

[22] Transcript of GFL's Q3 FY 18 Results Conference Call, App'x 4 (Feb. 8, 2018) at 6.

April or May 2018 (*i.e.*, its annual TFE capacity would increase from approximately 18,250 MT (50 MT/day) to 32,850 to 34,675 MT).[23]

Notably, GFL's primary use for TFE, by far, has been and will be for manufacturing PTFE.[24] [ ].[25] Indeed, despite the nearly 80 percent increase in TFE capacity identified in its quarterly financial conference call, GFL [ ].[26] GFL continued with the claim that it [ ].[27] Yet, the quarterly earnings call and the Environmental Impact Statement show that [ ]. In fact, when GFL filed its final questionnaire response in April 2018, the increase in TFE capacity was already underway, and the referenced pages of the Environmental Impact Assessment Report projected that products other than PTFE would absorb only about <u>12</u> percent of TFE production, and PTFE was projected to consume 77.8 percent of TFE production.

In addition to expansion of its TFE capacity, at the time GFL submitted its foreign producer questionnaire responses, the firm also was in the midst of increasing its PTFE

---

[23] *See id.* at 7.

[24] Environmental Impact Assessment Report, *supra* n.18, App'x 2 at 2.9 and 2.12-2.13.

[25] GFL's Questionnaire (Prelim.), *supra* n.15, CL48 at [ ] and GFL's Questionnaire (Final), *supra* n.15, CL190 at [ ].

[26] GFL's Questionnaire (Final), *supra* n.15, CL190 at [ ].

[27] *Id.*

production capacity. In June 2017, GFL prepared a Pre-feasibility Report proposing, *inter alia*, "to increase the production capacity of Poly Tetrafluroethylene, as well as related products, {to} add{} new products and … to install new Back Pressure TG (5MW) within the existing premises."[28] In that Pre-feasibility Report, GFL proposed starting construction related to these three tasks once it obtained regulatory clearances, with the goal of completing the entire project within 18-24 months.[29]

Following GFL's June 27, 2017 submission of an application for the Rs. 100 Crores (about $14.0 million) project through an online environmental clearance portal, an environmental impact assessment that occurred between October and December 2017, and regulatory meetings on August 16, 2017 and January 4, 2018, the state-level expert appraisal committee (SEAC) and state-level environment impact assessment authority (SEIAA) approved the project.[30] As part of the approved terms of reference for the project, GFL expanded production of PTFE by 500 MT per month, from its existing production level of 1,500 MT per month to 2,000 MT per month.[31]

---

[28] *See* Pre-feasibility Report, App'x 1 (June 2017) at 5 (Section 2(i)); *see also* Environmental Impact Assessment Report, *supra* n.26, App'x 2 at Executive Summary at 1. The address identified in the Pre-feasability Report [

]. The 5 MW boiler was intended to "meet the steam requirement for proposed production." Pre-feasability Report, App'x 1 at 6 (Section 2(ii)).

[29] *See* Pre-feasibility Report, *supra* n.26, App'x 1 at 11 (Section 8).

[30] *See* Environmental Impact Assessment Report, *supra* n.18, App'x 2 at 1.1, 1.3 (regarding value of project and timing of application and the SEAC's meetings); *id*. at 3.25, 3.30, 3.34, 3.44 (indicating, *e.g.*, that environmental surveys took place for meteorology (October to December 2017), air (October to December 2017), water (November 2017), and ecology and biodiversity (December 29-30, 2017); *see also id*. at Terms of Reference (including Letter from D.T. Vasavada, IFS, Member Secretary SEIAA (Gujarat) to GFL re: Your Proposal No. SIA/GJ/IND2/19710/2017 (Feb. 28, 2018)).

[31] *See* Environmental Impact Assessment Report, *supra* n.18, App'x 2 at Terms of Reference at 2; *id*. at Executive Summary at 2; *id*. at 2.10 (indicating that GFL also intended to increase production of gypsum from 10,529 to 12,768 MT/month, fluoro elastomers (FKM) from 150 to 300 MT/month, polyvenylidene fluoride (PVDF) from 100 to 250 MT/month, fluorinated

With the combination of "quite strong" market conditions, TFE capacity debottlenecking, and increased PTFE capacity, GFL's Managing Director, Mr. Jain reported to investors in a February 8, 2018 call that "in the next 6 to 8 months we will see even our expanded PTFE capacity being fully utilized."[32] In slides for an August 2018 investor presentation, GFL reported on "growth in PTFE," noting that "GFL has further expanded its monomer and polymer capacity to cater to the growing demand {for} its products in all geographies," that "{o}ver the next 6 quarters, GFL expects a ramp up in volumes of the new grades of PTFE which have been developed and introduced in these markets."[33] In its November 14, 2018 conference call with investors, Managing Director Jain noted that GFL had been developing additional grades of PTFE for the last two years, and that while these were "new" to GFL, they were "already in existence" and being produced by DuPont and 3M.[34] With regard to overall PTFE production, Managing Director Jain confirmed that it was producing about 1,300 MT per month, and in "the calendar year 2019 we expect to do about 1,550 tons to 1,600 tons per month, and calendar year 2020, we would go to around 1,750 tons per month, which is our fully expanded capacity of PTFE."[35]

---

ethylene propylene (FEP) from 100 to 250 MT/month and that it would commence production of 84 MT/month of intermediate vinylidene fluoride (VDF), 750 MT/month of difluoromethane (HFC-32), 200 MT/month of hydrofluosilicic acid (20 %), 500 MT/month of R-410 blends, and 25 MT/month of 1,1,3 Trichlorotetrafluoropropane (HCHC 224ca)); *id.* at 2.35 (indicating that GFL anticipated storing only about 60 MT of the 2,000 MT of PTFE produced per month).

[32] *See* Transcript of GFL's Q3 FY 18 Results Conference Call, *supra* n.22, App'x 4 at 6 (Feb. 8, 2018).

[33] *See* GFL Investor Presentation slides, App'x 5 (Aug. 2018) at 15, 18.

[34] Transcript of GFL's Q2 FY19 Results Conference Call, App'x 6 (Nov. 14, 2018) at 4, 6, 8, 11. The Commission's investigation covered multiple grades of PTFE. USITC Pub. 4801, at I-10 ("Each form of PTFE resin is sold in a variety of grades to obtain different properties for usefulness in specific applications.").

[35] GFL's Q2 FY19 Results Conference Call, *supra* n.32, App'x 6 at 6; *see also id.* at 9 (Deepak Asher, Director and Group Head (Corporate Finance), reported that GFL had spent Rs.

In other words, only a few weeks after filing its preliminary questionnaire response and five months before filing its final questionnaire response, GFL was informing investors that it would be producing approximately 42.3 million pounds in 2019, or more than [

].[36] Mr. Jain also advised in that same call that GFL already had the blueprints for further expansion of its PTFE operations, at a new site approximately 7-8 km away, since it already had expanded as much as it could at the existing location.[37] These excerpts from the appendices provide clear and convincing evidence that GFL submitted fraudulent foreign producer questionnaires to the Commission.

GFL clearly intended to use its expanded TFE and PTFE capacity to increase its exports to the United States. In slides for an August 2018 investor presentation, GFL estimated that its domestic market would grow "at around 12-15% per annum" and that "GFL, being the only Indian producer, expects to continue to enjoy a significant share of the domestic market … ."[38] Given these growth rates in its domestic market, GFL would have to increase its exports in order to achieve its projected production levels. As the firm's management confirmed, GFL now considers itself "a major supplier of PTFE in European, US, Latin American, and Asian markets," and believes that "with Western producers not able to meet growing requirement, and

---

150 crores in the first half of fiscal year 2019 (which began April 1, 2018), and Managing Director Jain reported that the "remaining CAPEX for completing all our current projects will be maybe another Rs. 50 Crores to 75 Crores."). In other words, by September 2018 (the first half of GFL's fiscal year), it seems GFL had already spent all or even more than the Rs 100 Crores that its June 2017 report projected would be needed for the entire PTFE and related fluoropolymers expansion project.

[36] *See* Confidential Posthearing Report, CL285 at VII-14, Table VII-6 (compiling GFL's Questionnaire (Final), CL190 at [ ]).

[37] *See* GFL's Q2 FY19 Results Conference Call, *supra* n.32, App'x 6 at 9, 15.

[38] *See* GFL Investor Presentation slides, *supra* n.31, App'x 5 at 15 (Aug. 2018).

Chinese manufacturers not offering the wide range of product grades with consistent quality, GFL is viewed as the only new reliable, committed, strategic long-term partner."[39] As such, "GFL expects to consolidate its position and emerge as one of the top 3 suppliers of PTFE worldwide."[40] With respect to the United States, Managing Director Jain told investors in a November 14, 2018 call that "we expect fairly significant increase in sales in the US."[41]

[ ].[42] Once again, this information clearly and convincingly demonstrates that GFL submitted material, false information in its foreign producer questionnaire responses filed in the underlying investigations.

[39] *See* GFL Investor Presentation slides, *supra* n.31, App'x 5 at 15 (Aug. 2018).

[40] *See* GFL Investor Presentation slides, *supra* n.31, App'x 5 at 18 (Aug. 2018). As one reason why the PTFE expansion project was "need{ed}" and "importan{t} to country and or region" GFL touted the products' export potential and noted that they would generate foreign exchange. *See* Pre-feasibility Report, supra n.26, App'x 1 at 6-7 (Sections 2(iii), (vi)); *see also* Environmental Impact Report, *supra* n.18, App'x 2 at 1.2–1.3 (describing the "Justification of the Project" as, *inter alia*, "{i}ncreasing demand for the end products in the global as well as local market" and that "{i}t will . . . earn foreign exchange for the country."); *id.* at 2.2, 8.1 ("Country will save valuable foreign exchange as import of {PTFE and new refrigerants} will reduce by corresponding amount. These products also have export potential and hence possibility of earning foreign exchange.").

[41] *See* GFL's Q2 FY19 Results Conference Call, App'x 6 at 8 (Nov. 14, 2018).

[42] *See* Confidential Posthearing Report, EDIS Doc. 647459 (June 11, 2018), CL285 at VII-14, Table VII-6 (compiling GFL's Questionnaire (Final), CL190 at [ ]).

C. Good Cause Exists to Amend Chemours' Complaints to Include the Fraud Allegations Because Chemours Previously Was Unaware of the Fraud

Under CIT Rule 15(a)(2), a "party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." As the *An Giang Fisheries* court explained, "In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'"[43] No such circumstances warranting a denial of leave exist here.

As background, we note that the Commission treats foreign producer questionnaire responses in their entirety as business proprietary information. Since only one foreign producer from India (GFL) responded to the questionnaire in the preliminary and final phases of the investigations, the data for the Indian industry were treated as business proprietary information throughout the proceeding and available only to persons authorized under the administrative protective order, which did not include any individuals at Chemours. After reviewing the public version of the Commission's two sets of Views and witnessing substantial increases in PTFE imports from India, Chemours polled its personnel to confirm whether their understanding of the market matched the Commission's description, including the Commission's findings that "{s}ubject producers' projected capacity for 2018 and 2019 is below the 2017 level."[44] As described in the Declaration in Appendix 7, Chemours' sales personnel routinely collect

[43] *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 118 F. Supp. 3d 1368, 1371 (Ct. Int'l Trade 2015) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

[44] USITC Pub. 4801 at 38 n.282.

intelligence about the operations of Chemours' competitors, including GFL. This intelligence, which was then corroborated by statements that GFL officials provided to other audiences, contradicts the Commission's description of the market. Consistent with Rule 15(a)(2), Chemours respectfully requests that this Court freely grant this request to amend its Complaints to reflect its fraud claims.

D. Conclusion and Request for Relief

For the reasons discussed above, the information appended to this motion constitutes clear and convincing evidence sufficient to make a *prima facie* case that the Commission's PTFE proceedings under review were tainted by material fraud. On this basis, we respectfully request that the Court grant this motion to supplement the record to include the appended evidence. We also request that the Court grant us leave to amend our Complaints to include the claims of fraud. Finally, because the fraudulent foreign producer questionnaire responses submitted by GFL were material to the Commission's negative determinations regarding imports of PTFE from China and India, which the Commission cumulated, we further request that the Court remand the challenged final determinations for the Commission's reconsideration in light of the new information.

We request confidential treatment for the information contained in brackets in this motion and in Appendix 3 and Appendix 7. This bracketed information includes business proprietary information under 19 U.S.C. § 1677f(b)(1) obtained under protective order as well as competitive intelligence gathered by Chemours and information on the process that Chemours uses to gather competitive intelligence, the disclosure of which would cause substantial harm to

Chemours' competitive position. We agree to the disclosure of this information only to authorized parties and pursuant to a protective order.

Respectfully submitted,

/s/James R. Cannon, Jr.

James R. Cannon, Jr.
Mary Jane Alves
Jonathan M. Zielinski
Ulrika K. Swanson
James E. Ransdell
CASSIDY LEVY KENT (USA) LLP
900 19th Street NW, Suite 400
Washington, DC 20006
(202) 567-2318

*On Behalf of Chemours*

March 8, 2019

**PUBLIC VERSION**

**List of Appendices**

1. Pre-feasibility Report, Proposed Public Document 130
2. Environmental Impact Assessment Report (Mar. 2018), Proposed Public Document 131
3. [

   ], Proposed Confidential Document 322
4. Transcript of GFL's Q3 FY 2018 Results Conference Call, Proposed Public Document 132
5. GFL Investor Presentation Slides (August 2018), Proposed Public Document 133
6. Transcript of GFL's Q2 FY 19 Results Conference Call, Proposed Public Document 134
7. Declaration from Denise Dignam