Slip Op. 20-61

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **THE CHEMOURS COMPANY FC, LLC,** | |
| Plaintiff, | |
| v. | **Before: Timothy M. Reif, Judge** |
| **UNITED STATES,** | |
| Defendant, | **Court No. 18-00174** |
| and | **PUBLIC VERSION** |
| **AGC CHEMICALS AMERICA, ET AL.,** | |
| Defendant-Intervenors. | |

## <u>OPINION</u>

[The Determination of the United States International Trade Commission is remanded in conformity with this opinion.]

Dated: May 6, 2020

<u>Mary J. Alves</u>, Cassidy Levy Kent (USA) LLP of Washington, DC, argued for plaintiff.  With her on the brief were <u>James R. Cannon, Jr.</u>, <u>Ulrika K. Swanson,</u> and <u>James E. Randsell</u>.

<u>Karl S. von Schriltz</u>, Attorney-Advisor, United States International Trade Commission of Washington, DC, argued for defendant.  With him on the brief were <u>Andrea C. Casson</u>, Assistant General Counsel for Litigation, and <u>Dominic L. Bianchi</u>, General Counsel.

Jordan C. Kahn, Grunfeld, Desiderio, Lebowitz Silverman & Klestadt LLP of New York, NY, for defendant-intervenors PTFE Processors Alliance and Chinese respondents.  With him on the brief was Max F. Schutzman.

Russell A. Semmel, Arent Fox, LLP of Washington, DC, for defendant-intervenors Gujarat Fluorochemicals Limited.  With him on the brief were Matthew M. Nolan, John M. Gurley, and Claudia D. Hartleben,

Reif, Judge: Before the court is the motion for judgment on the agency record, pursuant to United States Court of International Trade ("USCIT") Rule 56.2, of plaintiff The Chemours Company FC, LLC.  See Pl.'s Mot. For J. on the Agency R., ECF No. 69–1 ("Pl. Br.").  By its motion, plaintiff contests the final negative material injury and threat of material injury determinations of the United States International Trade Commission ("Commission") in its antidumping and countervailing duty investigations of Polytetrafluorethylene Resin ("PTFE") from the People's Republic of China ("China") and India.  See Polytetrafluoroethylene Resin from China and India, Inv. Nos. 701-TA-588 and 731-TA-1392-1393, USITC Pub. 4801 (July 2018) (Final), and Polytetrafluoroethylene Resin from China and India, Inv. Nos. 731-TA-1392-1393, USITC Pub. 4841 (Nov. 2018) (Final) (collectively, "Final Determinations").

The Commission opposes plaintiff's motion, asking the court to sustain the Commission's determinations.  Def. ITC's Opp'n to Pl.'s Mot. for J. on the Agency R., ECF No. 82 ("Def. Opp. Br.").

Defendant-intervenors, the PTFE Processors Alliance ("PPA"), Chinese Respondents[1] and Gujarat Fluorochemicals Limited ("GFL") join the Government in

---

[1] The Chinese respondents are Zhejiang Jusheng Fluorochemical Co., Ltd., Shandong Dongyue Polymer Material Co., Ltd., Shanghai Huayi 3F New Materials Sales Co., Ltd.,

opposing plaintiff's motion.  *See* Def.-Ints.' PPA and Chinese Respondents Resp. to

Pl.'s Rule 56.2 Mot. For J. on the Agency R., ECF No. 84 ("Chinese Def.-Ints.' Br.");

Resp. Br. of Def.-Ints. GFL in Opp'n to Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF

No. 86 ("GFL Def.-Ints.' Br.").  For the reasons discussed below, the Final

Determinations are remanded to the Commission for action in conformity with this

decision.

## BACKGROUND

On September 28, 2017, plaintiff filed antidumping and countervailing duty

petitions with the United States Department of Commerce ("Commerce") and the

Commission.  *Polytetrafluoroethylene ("PTFE") Resin from China and India,* 82 Fed.

Reg. 46,284 (Int'l Trade Comm'n Oct. 4, 2017) (institution of antidumping and

countervailing duty investigations).  On November 13, 2017, the Commission published

preliminary affirmative injury determinations.  *Polytetrafluoroethylene (PTFE) Resin from

China and India*, Inv. Nos. 701-TA-588 and 731-TA-1392-93 (Preliminary), USITC Pub.

4741 (Nov. 2017) at 3.  On February 28, 2018, Commerce published its preliminary

countervailing duty determination concerning India.  *Polytetrafluoroethylene Resin from

India*, 83 Fed. Reg. 9842 (Dep't Commerce Mar. 8, 2018) (preliminary determination).

On April 30, 2018, Commerce published its preliminary antidumping duty

determinations.  *Polytetrafluoroethylene Resin from the People's Republic of China*, 83

Fed. Reg. 20039 (Dep't Commerce May 7, 2018); *Polytetrafluoroethylene Resin from*

---

Zhonghao Chenguang Research Institute of Chemical Industry Co., Ltd., Jiangxi Lee &
Man Chemical Ltd., Jiangsu Meilann Chemical Co., Ltd., and China Chamber of
Commerce of Metals, Minerals & Chemical Importers.

*India*, 83 Fed. Reg. 20035 (Dep't Commerce May 7, 2018) (preliminary determination).

On May 14, 2018, Commerce published its final countervailing duty determination.

*Polytetrafluoroethylene Resin from India*, 83 Fed. Reg. 23422 (Dep't Commerce May

21, 2018).  On July 6, 2018, the Commission published its final negative determination

with respect to subsidized imports from India.  *Polytetrafluoroethylene Resin from India*,

83 Fed. Reg. 32150 (Int'l Trade Comm'n July 11, 2018); Views of the Commission

(Final), CD 321 (Int'l Trade Comm'n July 6, 2018), ECF No. 33-1 ("*Views*").  On

September 26, 2018, Commerce published its final antidumping duty determinations

concerning China and India.  *Polytetrafluoroethylene Resin from the People's Republic

of China*, 83 FR 48590 (Dep't Commerce September 26, 2018); *Polytetrafluoroethylene

Resin from India*, 83 FR 48594 (Dep't Commerce September 26, 2018).  On November

13, 2018, the Commission published its final negative determination with respect to

dumped imports from China and India.  *Polytetrafluoroethylene (PTFE) Resin from

China and India*, 83 Fed. Reg. 51501 (Int'l Trade Comm'n Oct. 11, 2018); Views of the

Commission (Final), CD 324 (Int'l Trade Comm'n Nov. 13, 2018).[2]

Plaintiff challenges the following findings of the Commission: (1) the definition of

domestic industry included processors of PTFE; (2) the volume of the subject imports,

while significant, fluctuated "in tandem" with demand; (3) the prices of the subject

imports brought pervasive underselling that (a) did not cause a shift in the domestic

---

[2] The record for these injury determinations in the two antidumping investigations are
the same as the record for the injury determination in the countervailing duty
investigation.  *See Views* at 4 n.4; Views of the Commission (Final) at 4, CD 324 (Int'l
Trade Comm'n Nov. 13, 2018).  The Commission's *Views* in connection with the latter
determination are cited throughout this opinion.

industry's market share, (b) did not cause significant price depression or price suppression, and (c) continued through the final quarter of the period of investigation ("POI"); (4) the subject imports did not significantly impact the domestic industry; and, (5) the domestic industry was not threatened with material injury.  Pl. Br. at 9-12, 34.

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c).

## STANDARD OF REVIEW

This Court is required to assess the factual and legal findings underpinning the Commission's determinations and "hold unlawful any determination, finding or conclusion … unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 USC § 1516a(b)(1)(B)(i).  The substantial evidence standard is both limited and deferential.  "Substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Universal Camera Corp. v. NLRB*, 349 U.S. 474, 477 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 205 U.S. 197, 229 (1938)).  Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 620 (1966).  *See also ITG Vonna Corp. v. U.S. Int'l Trade Comm'n,* 41 CIT ___, ___, 253 F. Supp. 3d 1339, 1347 (2017), *aff'd*, 753 Fed. App'x 913 (Fed. Cir. 2019).

The court's review of a Commission determination is limited to the administrative record.  19 U.S.C. § 1516a(b)(1)(B)(i).  This Court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the

substantiality of the evidence.'" *Nippon Steel Corp. v. United States,* 337 F.3d 1373,

1379 (Fed. Cir. 2003) (quoting *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556,

1562 (Fed. Cir. 1984).  To provide a reasoned explanation, the Commission must "make

the necessary findings and have an adequate evidentiary basis for its findings" and

"examine the relevant data and articulate a satisfactory explanation for its action

including a rational connection between the facts found and the choice made." *In re

NuVasive, Inc.,* 842 F.3d 1376, 1382 (Fed. Cir. 2016) (internal citations omitted).

## DISCUSSION

Under the Tariff Act of 1930, the Commission is charged with determining

whether a domestic industry is materially injured or threatened with material injury by

reason of unfairly subsidized or dumped imports.  19 U.S.C. § 1671d(b)(1); 19 U.S.C. §

1673d(b)(1).  The Commission will issue an affirmative determination if it finds "present

material injury or a threat thereof" and makes a "finding of causation." *Hynix

Semiconductor, Inc. v. United States*, 30 CIT 1208, 1210, 431 F. Supp. 2d 1302, 1306

(2006) (citation and quotation marks omitted).  "Material injury" is defined as "harm [to

the domestic industry] which is not inconsequential, immaterial, or unimportant."  19

U.S.C. § 1677(7)(A).

In making a material injury determination, the Commission evaluates: (1) the

volume of subject imports; (2) the price effects of subject imports on domestic like

products; and, (3) the impact of subject imports on the domestic producers of domestic

like products in determining whether there is material injury, or threat of material injury,

by reason of the subject imports.  19 U.S.C. § 1677(7)(B)(i)(I)-(III).

## I. Domestic Industry

The Tariff Act of 1930 defines "industry" as "the producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." 19 U.S.C. § 1677(4)(A).

In the present investigations, the Commission defined the "domestic like product" as all domestically manufactured products corresponding to the imports within the scope of the investigations, including PTFE in granular, dispersion and fine powder forms.  *Views* at 7.[3]  Plaintiff does not challenge the Commission's definition of the like product.  *See* Pl. Br. at 6.

The Commission in turn defined the domestic industry to include not only the two *integrated* chemical manufacturers of PTFE (The Chemours Company FC, LLC and

---

[3] The Commission described PTFE as

> a polymer more commonly known as Teflon, a registered trade name of Chemours.  It is used for various applications primarily for its low friction properties.  PTFE is used to produce gaskets, pipe liners, films, or coatings on another surface, among other products.

> All forms of PTFE are produced from tetrafluoroethylene ("TFE").  Because TFE is a volatile chemical, all domestic manufacturers of PTFE begin first by producing TFE on site and then polymerizing it to produce PTFE.  PTFE is produced in granular, fine powder, and dispersion (liquid) forms.

*Views* at 7-8.

Daikin America Inc.), but also six[4] domestic *processors* of PTFE.[5]  *Views* at 20.  The

Commission applied a multi-factor test in reaching its determination, examining: (1) the

source and extent of the firm's capital investment; (2) technical expertise; (3) value

added to the product in the United States; (4) employment levels; and, (5) the quantity

and type of U.S.-sourced materials used in production of the like product.  *Views* at 18 -

20.  Based on its review of the five factors, the Commission determined to include the

PTFE processors in the domestic industry on the grounds that the processors

"engage[d] in sufficient production-related activity," in particular, demonstrating "high

levels of employment, value added, and technical expertise."  *Id*. at 20.

        The Commission stated that the capital investments of the integrated

manufacturers were "far greater than those of processors," *Views* at 18, but found that

the capital investments of the processors were nonetheless "not insubstantial."  *Id.* at

19.  Capital investments by integrated manufacturers were [[                    ]] on a net

asset basis from 2015 to 2017, while capital investments by processors were [[

     ]], also on a net asset basis for the same period.  *Final Staff Report*, at Table III-

4, CD 285 (Int'l Trade Comm'n June 11, 2018), ECF No. 33-2 ("*Staff Report*").

        Next, the Commission considered the technical expertise of the integrated

producers and processors.  The Commission (1) described their respective production

---

[4] The Commission determined to exclude one processor, GFL, from the "domestic industry" based on the Commission's application of the "related parties" provision of the statute.  *Views* at 26 (citing 19 U.S.C. § 1677(4)(B)).

[5] The Commission refers to all blenders, fillers and compounders of PTFE as "processors" because they all perform similar functions and the terms are used interchangeably by parties to the investigation.  *Views* at 17 n.71.

processes, (2) reported their respective average hourly wages, and (3) noted their respective research and development (R&D) expenditures.  The Commission assessed that technical expertise involved in U.S. production activities by integrated producers amounted to [[                          ]] based on aggregate research and development in 2017, while for processors the total was significantly higher, at [[                          ]] on the same basis.  *Views* at 18 (citing *Staff Report* at Table III-4).  The Commission acknowledged that integrated producers utilized "volatile chemicals" in a "highly controlled process" to produce PTFE.  *Views* at 18.  The Commission noted that, in contrast, PTFE processing involved "many diverse formulas and recipes for manufacturing filled, blended or compounded PTFE."  *Id.*  The Commission observed that integrated producers paid production and related workers ("PRWs") hourly wages of [[    ]] to [[    ]] from 2015 to 2017, while PTFE processors paid PRWs higher hourly wages of [[    ]] to [[    ]] over the same period.  *Views* at 18 (citing *Staff Report* at Tables III-15 and III-16).  The Commission found that "processors' R&D expenses during the POI exceeded those of [the integrated producers]," referencing data that showed that processors spent [[        ]] falling slightly to [[        ]], annually, on research and development over the 2015 to 2017 period, while integrated producers spent [[        ]] rising to [[        ]], annually, on R&D over the same period.  *Views* at 18 (citing *Staff Report* at Table VI-8).  The Commission noted the difference in chemical operations between processors and integrated producers in its *Views*, but relied on the wage and R&D information in arriving at its finding that processors possessed a high degree of technical expertise.  *Views* at 19.

Turning to value added, the Commission stated that "although [integrated producers] contribute[] greater value added than PTFE processing, the value added by PTFE processing is still high."  *Views* at 19.  The Commission found that value added by integrated producers was [[          ]] percent of the total cost of goods sold ("COGS") from 2015 to 2017, while finding that processors' value added was [[

]] percent from 2015 to 2017.  *Id.* (citing Staff *Report* at Table III-4).

The Commission stated that the employment numbers for integrated producers and processors "are roughly comparable."  *Views* at 19.  The Commission noted that integrated producers employed [[          ]] workers from 2015 to 2017, while processors employed [[        ]] workers during the same period.  *Id.* (citing *Staff Report* at Table III-4).

The Commission stated that processors received an "appreciable proportion" of their inputs from domestic sources, although "this proportion was smaller than the proportion of subject import inputs."  *Views* at 20.  Integrated producers sourced [[

]] of materials from the United States from 2015 to 2017, while processors sourced [[            ]] of materials from the United States during the same period.  *Views* at 18 - 19; *Staff Report* at Table III-4.

Based on its review of the five factors — technical expertise, value added, employment levels, quantity and type of parts sourced in the United States and capital investment — the Commission determined that "the processors engage[d] in sufficient production-related activity to be considered producers of the domestic like product."  *Views* at 20.

Plaintiff first takes issue with the Commission's finding that the processors possess sufficient technical expertise.  Pl. Reply Br. at 4.  Plaintiff argues that workers for processors do not have to work with "volatile chemicals" and, therefore, "do not undergo the same hazardous material safety training that [workers for integrated producers] need to avoid explosions."  Pl. Reply Br. at 4.  Plaintiff argues further that average wages and R&D expenses cannot be the data on which the Commission relies in determining the level of technical expertise provided by PTFE processors.  Pl. Br. at 18.  Plaintiff argues in particular that dumped and subsidized imports adversely affected the hourly wages and R&D of integrated producers; therefore, the data as to those factors cannot be compared to those data for the processors.  *Id.*  With regard to the four other factors, plaintiff argues that because processors engaged in lower levels of production-related activities than integrated producers with respect to each factor, "the [Commission's] determination that processors perform[ed] sufficient production-related activities is not supported by the record."  Pl. Br. at 19.

The Commission considered and reasonably responded to these contentions. The Commission noted, for example, that it is not relevant whether the activities of processors were at the same level as or at a higher level than integrated producers, but rather whether the activities of processors were sufficient on their own for the processors to qualify as domestic producers.  See Views at 18 – 20.  *See* also Def. Opp. Br. at 2.  The Commission expressly recognized processors' lower levels of production-related activities regarding capital investment, value added, employment and U.S.-sourced materials.  *Views* at 19 - 20.  Specifically, the Commission found that

capital investment was "not insubstantial," that processors contributed less value added than integrated producers but that the level of value added was "still high," that employment numbers were "roughly comparable," and that processors used an "appreciable portion" of U.S.-sourced materials.  *Views* at 19 - 20.

The court concludes that the Commission's determination reflects that it considered plaintiff's arguments and the record in making its determination. Accordingly, the Commission's determination to include PTFE processors in the domestic industry is supported by substantial evidence.

## II.  Volume

The Tariff Act of 1930 mandates that the Commission consider "whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).

In this case, the Commission determined that the volume of subject imports, both in absolute terms and relative to consumption, was significant.  *Views* at 43.  In its *Views*, the Commission found that the volume of subject imports fluctuated "in tandem" with demand during the POI.  *Views* at 42.  Subject imports declined in 2016, when apparent U.S. consumption declined, and subject imports increased in 2017, along with apparent U.S. consumption.  *Views* at 42 - 43.  The Commission found, in addition, that cumulated subject imports gained market share from 2015 to 2017, but solely at the expense of nonsubject imports rather than at the expense of the domestic industry.

*Views* at 43.  The Commission added that demand "fluctuated but ultimately showed little change."  *Views* at 38.

Plaintiff argues that the Commission's characterization that subject import volume fluctuated "in tandem" with demand is not supported by substantial evidence. Plaintiff points to data in the record that demonstrate that "subject imports increased at a [[    ]] greater rate" than U.S. consumption during the POI.  Pl. Br. at 22.

The Commission noted that its use of "in tandem" was intended to state only that the subject imports and demand fluctuated in the same direction, not necessarily at the same rate.  Def. Opp. Br. at 26.  As the Supreme Court stated, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  *See also NSK Corp. v. United States*, 32 CIT 966, 969, 577 F. Supp. 2d 1322, 1329 (2008).  As this Court held in *NSK*, "the fact that plaintiffs 'can point to evidence of record which detracts from the evidence which supports the Commission's decision and can hypothesize a reasonable basis for a contrary determination is neither surprising nor persuasive.'"  *NSK*, 32 CIT at 968-69, 577 F. Supp. 2d at 1329 (citing *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984)).  The *NSK* court continued, "[t]herefore, the court will not 'displace' an agency's 'choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.'"  *Id.* at 969, 1329 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951)).

In sum, the court concludes that the Commission's volume analysis was supported by

substantial evidence.

## III.  Price

Section 771(7)(C)(ii) of the Tariff Act provides that, in evaluating the price effects

of the subject imports, the Commission shall consider whether:

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).  The statute requires that the Commission consider whether

subject imports have engaged in significant price underselling, as well as whether there

has been significant price depression or suppression.

### A.  Effects on Market Share and Domestic Prices

In its *Views*, the Commission examined: (1) underselling by the subject imports;

(2) the relationship of price trends to trends in (a) import volumes and (b) domestic

demand and apparent consumption; and, (3) significant price suppression or

depression.  The court examines in turn the Commission's consideration of and findings

as to each.

First, with respect to underselling, the Commission collected quarterly pricing

data from U.S. producers and importers for five PTFE products, accounting for [[    ]]

percent of U.S. producers' U.S. shipments of PTFE, [[    ]] percent of U.S. shipments

from China and [[    ]] percent of U.S. shipments from India in 2017.  *Views* at 44.  The

Commission found that price was one of several important factors in PTFE purchasing decisions, and that there was "significant underselling by subject imports." *Id.* at 44 - 45.  The Commission found further that the cumulated subject imports undersold the domestic like product in 92 of 104 comparisons by an average margin of 29.4 percent, with overselling in the remaining comparisons by an average margin of 17.1 percent. *Id.* at 45.

The Commission also examined the relationship between price trends, on the one hand, and import demand, domestic consumption and U.S. industry market share, on the other.  The Commission found that, despite significant volumes of low-priced subject imports, the domestic industry did not lose market share to the subject imports during the POI.  *Id.* at 44 - 45.  In fact, the Commission found that the domestic industry gained market share in 2017, when cumulated subject import volume was highest and those imports were engaged in pervasive underselling.  *Views* at 45 - 46; Def. Opp. Br. at 28 - 29.[6]

The Commission relied also on purchaser data for its analysis of market share trends during the POI.  *Views* at 46 - 47 n.225.  In this regard, the Commission found that these data showed that even if some purchasers increased purchases of subject imports due to low prices, these purchases did not lead the domestic industry to lose market share over the POI.  *Id*.  Purchaser data indicated that [[      ]] responding

---

[6] *See also Views* at 50 (citing *Staff Report* at Table C-6).  The Commission found that the domestic industry's market share increased from [[     ]] percent in 2015, to [[     ]] percent in 2016, and to [[     ]] percent in 2017, notwithstanding significant underselling by subject imports.  *Id.*

purchasers specified price as a primary reason that they purchased subject imports

instead of the domestic like product.  However, the Commission found that, overall,

responding purchasers increased their share of total purchases from the domestic

industry during the POI.  *Id.*  Therefore, the Commission determined that significant

underselling did not enable the subject imports to capture market share from the

domestic industry and that, in fact, the domestic industry captured market share from

nonsubject imports.  *Id.* at 48.

        In regard to price suppression and price depression, the Commission found that

cumulated subject imports did not depress prices to a significant degree or prevent price

increases to a significant degree.  *Id.* at 46 - 48.  With respect to price depression, the

Commission observed that prices for the domestic like product "generally decreased

from 2015 to 2016, and then increased in 2017."  *Id.* at 46.  In fact, the Commission

observed, "when prices for the domestic like product declined to their lowest level during

the POI, the volume of cumulated subject imports also declined . . . to the lowest levels

of the POI."  *Id.*  The Commission added, "[p]rices for the domestic like product

increased in 2017, as the volume and market penetration of cumulated subject imports

also increased and underselling remained pervasive."  *Id.*[7]

        On this basis, the Commission found that "the record does not indicate a causal

nexus between subject import volumes and the declines in prices for the domestic like

_____

[7] The Commission states that it did not find it necessary to respond specifically to
Plaintiff's argument concerning its 2016 business strategy, Pl. Br. at 31, since the
Commission's reasoning with respect to the relationship between subject imports and
price was clear in its *Views*.  Def. Opp. Br. at 31.

product during 2016," and "the cumulated subject imports did not depress prices of the

domestic like product to a significant degree."  *Id.*  Rather, the Commission found that

the record indicated that price trends for the domestic like product correlated with

demand trends and other conditions of competition in the U.S. market during the POI.

*Id.* at 47.[8]

The Commission also found that cumulated subject imports did not prevent price

increases for the domestic like product that otherwise would have occurred.  *Id.* at 47 -

48.  The Commission observed that the domestic industry's cost of goods sold to net

sales ("COGS/NS") ratio worsened from 2015 to 2016.  *Id*.  However, because demand

also declined in 2016, the Commission found that the domestic industry could not have

expected to increase prices that would be reflected in a better COGS/NS ratio that year.

*Id*.  Because the domestic industry was able to improve its cost recovery in 2017, *Id.* at

47, the Commission found that cumulated subject imports did not cause price

suppression.  *Id.*  The Commission determined that "the record indicates that prices for

the domestic like product correlate with demand trends in the U.S. market rather than

the presence of cumulated subject imports in the market."  *Id.*

Plaintiff raises two principal types of objections to the Commission's price

analysis.  First, plaintiff argues that the Commission in several areas "paid little heed to

the record evidence" related to pricing.  Pl. Br. at 29.  For example, plaintiff maintains

---

[8] Further, the Commission argues that it noted "confirmed lost revenue reports from purchasers" in its analysis.  Def. Opp. Br. at 32.  However, the Commission did not find this evidence to "detract from its finding that cumulated subject imports did not have significant price effects" because "the record contains a low number of confirmed lost revenue reports from purchasers."  *Views* at 46 n.225.

that the Commission did not focus on the pricing evidence, but "[i]nstead … focused on

the domestic industry's market share." *Id.*  Plaintiff argues that the Commission missed

the point — the way in which subject imports were able to capture market share from

nonsubject imports was by offering lower prices, thereby, "gaining more from nonsubject

imports than the domestic industry during a [POI] marked by limited demand change."

*Id.* at 30.

In that regard, plaintiff argues further that "the fact that the large and increasing

subject import volumes did not reduce the domestic industry's overall market share

does not mean that the domestic industry did not lose sales to subject imports or suffer

from depressed and suppressed price levels." *Id.* at 29.  Plaintiff argues that the

domestic industry had to reduce prices to avoid the risk of losing sales and being unable

to operate at high capacity utilization in 2016.  *Id.* at 31.  Plaintiff discusses the

deterioration of the COGS/NS ratio from 2015 to 2016, and then its improvement in

2017, arguing that the improvement was due only to the actions of the domestic industry

in reducing prices.  *Id.*  Plaintiff contends that the Commission dismissed this evidence

in its analysis.  *Id*. at 31 - 32.

Plaintiff also raises several additional arguments with respect to the

Commission's evaluation of the pricing data.  For example, plaintiff maintains that "the

statute does not require underselling, let alone significant underselling, for affirmative

determinations."  *Id*. at 27.  Similarly, plaintiff argues that "[b]ecause the Commission

found significant underselling, it was not necessary for the Commission also to find

additional price effects such as price depression or price suppression."  *Id.* at 30.

Finally, plaintiff states that the Commission "in effect, engrafted onto the statutory language a new condition that there must be a shift in market share from the domestic industry to the subject imports."  *Id.* at 4.

This Court has consistently upheld the right of the Commission to weigh the evidence and has rejected challenges to Commission determinations when those challenges relied only upon an alternative view of the evidence.  *See, e.g., CP Kelco US, Inc. v. United States,* 38 CIT ___, ___, 24 F. Supp. 3d 1337, 1341 - 42 (2014) (affirming the Commission's finding that there was no price depression or suppression based on patterns in the COGS/NS ratio of the domestic industry); *Nitrogen Solutions Fair Trade Comm. v. United States,* 29 CIT 86, 99-102 (2005) (finding that the failure of subject imports to decline exactly in tandem with natural gas prices did not refute the existence of the positive correlation found by the Commission)*; JMC Steel Group v. United States,* 28 CIT ___, ___, 24 F. Supp. 3d 1290, 1320 (2004) (rejecting plaintiff's argument for a *per se* rule that a growing volume of subject imports which undersell the domestic like product, in the context of a highly competitive market for a fungible good, necessarily must produce negative price effects)*; Acciai Speciali Terni, S.P.A. v. United States,* 19 CIT 1051, 1061 - 62 (1995) (concluding that the Commission's determination was supported by substantial evidence and that plaintiff's alternative view of the evidence, including the price data, did not "disturb" the determination).

The court determines that the Commission's price analysis pertaining to underselling is supported by substantial evidence.  In its *Views*, the Commission considered precisely the same data on which plaintiff bases its argument, including

nonsubject import data and demand trends.  *See Views* at 46 - 47.  Plaintiff's arguments

amount to a request that the court reweigh the evidence in plaintiff's favor, rather than

that the Commission did not consider certain evidence in its *Views*.

The court determines further, based on the discussion of the Commission's

determination above, that the Commission's price depression and suppression findings

are supported by substantial evidence.

## B.  Post-Petition Data

The Tariff Act of 1930 instructs the Commission to consider "whether any change

in the volume, price effects, or impact of imports of the subject merchandise since the

filing of the petition … is related to the pendency of the investigation and, if so, the

Commission may reduce the weight accorded to the data for the period after the filing of

the petition in making its determination of material injury."  19 U.S.C. § 1677(7)(I).

According to the SAA, the grant of this discretion is in recognition that the filing of the

petition "can create an artificially low demand for subject imports, thereby distorting

post-petition data compiled by the Commission."  Statement of Administrative Action

accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1, at

854 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4186.  The Commission has wide

discretion in deciding how to weigh post-petition information.  *Nitrogen Solutions Fair*

*Trade Comm. v. United States*, 19 CIT 86, 101, 358 F. Supp. 2d 1314, 1329 (2005)

("Cases applying [19 U.S.C. § 1677(7)(I)] have recognized the ITC's significant

discretion in its weighing of such information"); *LG Elecs., Inc. v. United States*, 38 CIT

___, ___, 26 F. Supp. 3d 1338, 1353 (CIT 2014) ("the language of [19 U.S.C. §

1677(7)(I)] grants broad discretion to the Commission to consider whether 'any change' is 'related to the pendency of the investigation'").

Plaintiff in this case presents two arguments in challenging the Commission's post-petition analysis.  Pl. Br. at 35.  First, the Commission declined, despite plaintiff's request during the investigation, to accord reduced weight to pricing data — in particular, prices for the subject imports — for the fourth quarter of 2017.  *Views* at 44 - 45.  In plaintiff's view, the filing of the petitions led to increased prices for the subject imports.  Pl. Br. at 35.  Plaintiff challenges the Commission's decision to focus on prices of the *domestic* like product in this aspect of its determination.  *Id.*

Second, plaintiff argues that the Commission erred in declining to associate the rise in prices with the filing of the petition.  *Id.* at 35 (citing *Views* at 44 - 45).  The Commission made this determination based on the increase of subject import volume "throughout 2017, even after the filing of the petitions."  *Id.*  Regarding this determination, plaintiff criticizes the Commission's reliance on increases in post-petition subject import volume data, because the statute does not require a decline in the volume of subject imports for the Commission to apply reduced weight to post-petition data.  Pl. Br. at 35.

The Commission's determination stated the following, in relevant part:

We consider *all quarterly price comparisons* for our price effects analysis. Petitioner argues that we should accord reduced weight to the data for the fourth quarter of 2017, maintaining that the filing of the petitions in this investigation led to increased *prices*.  However, we observe that subject import *volume* increased throughout 2017, even after the filing of the petitions, and *prices for the domestically produced products* began to rise in early 2017, prior to the filing of the petitions in September 2017.

Additionally, quarterly pricing product data on the record do not show that subject *import quantities* fell consistently following the filing of the petition.

*Views* at 44 – 45 (emphasis supplied).

The Commission in its *Views* did not address the increase in *subject import prices* in the final quarter of 2017.  Because the Commission failed to address this evidence, it is not clear, based on the Commission's *Views*, that the Commission considered all of the evidence on the record.  It is not sufficient for the Commission to state in passing that "it considered all quarterly price comparisons," when, as here, the Commission thereafter declined to make any mention of import price data even as it mentioned import volume and domestic price data.  Rather, the Commission's determination must address and provide an explanation for how those data are consistent with the Commission's decision not to discount the data for the fourth quarter of 2017.  *See Timken U.S. Corp. v. United States*, 28 CIT 62, 82, 310 F. Supp. 2d 1327, 1344 (2004); *Taiwan Semiconductor Indus. Ass'n v. United States*, 24 CIT 220, 238, 105 F. Supp. 2d 1363, 1379 - 80 (2000).

Contrary to plaintiff's argument, the Commission did not suggest that a decrease in subject import volume in the post-petition period is required to apply reduced weight to post-petition data.  *Views* at 43 - 48.  The Commission's analysis appears to show simply that a decrease in the volume of the subject imports buttressed consideration of subject import volume as one of the three factors (volume, price effects, and impact) identified by the statute.  *Id.*

The Commission's decision to rely on domestic price trends in assessing a possible change in the price effects of subject imports was not supported by substantial

evidence.  The Commission in its *Views* did not address the increase in *subject import*

prices in the final quarter of 2017.  By failing to address these prices, it is not clear,

based on the Commission's *Views*, that the Commission considered all of the evidence

on the record.  It is notable that the Commission has previously considered subject

import prices in determining whether to apply reduced weight to post-petition data.  *See*

*Softwood Lumber from Canada*, Inv. Nos. 701-TA-566 and 731-TA-1342

(Final)(Remand), USITC Pub. 5010 (Dec. 2019); *Xanthan Gum from Austria and China*,

Inv. No. 731-TA-1202-1203 (Final), USITC Pub. 4411 at 30, n. 223 (Jul. 2013).

This Court has previously affirmed the Commission's reliance on domestic price

trends in assessing post-petition effects.  *See LG Elecs., Inc. v. United States Intern.*

*Trade Comm'n*, 26 F. Supp. at 1353 (affirming the Commission's finding of post-petition

effects based in part on the industry's ability to realize the benefits of higher prices post-

petition).  However, in *LG Elecs., Inc.*, unlike in this case, the Commission relied on

those data in the context of a substantial amount of corroborating evidence related to

price suppression and price depression.  *Id.* at 1350.  The court ruled that "[t]he

Commission reasonably exercised the discretion afforded to it by Congress to discount

the value of post-petition data."  *Id.* at 1355.  By contrast, in the instant case, the

Commission did not identify substantial corroborating data for its findings with respect to

prices for the *domestic* like product.

Accordingly, the court remands this determination to the Commission to explain

its lack of findings with respect to subject import prices in the Commission's post-

petition analysis.  The Commission may make additional determinations that it deems

necessary to account for such explanations.  *See JMC Steel Group v. United States,* 39

CIT ___, ___, 70 F. Supp. 3d 1309, 1312 - 13 (2015).

## IV.  Impact

Section 771(7)(C)(iii) of the Tariff Act provides that, in evaluating the impact of

subject imports on the domestic industry, the Commission "shall evaluate all relevant

economic factors which have a bearing on the state of the industry," including, but not

limited to:

> (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
>
> (II) factors affecting domestic prices,
>
> (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
>
> (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and
>
> (V) in a proceeding under part II of this subtitle [concerning the imposition of antidumping duties], the magnitude of the margin of dumping.

19 U.S.C. § 1677(7)(C)(iii).  The statute requires that the Commission analyze these

factors "within the context of the business cycle and conditions of competition that are

distinctive to the affected industry."  *Id.*

The Commission found that the domestic PTFE industry improved by nearly all

performance measures during the POI.  *Views* at 49.  Specifically, "almost every

indicator of industry performance was in a better position in 2017 than in 2015," despite

several indicators declining in 2016, when U.S. demand fell.  *Id*.  The Commission

considered the domestic producers' capacity, production, capacity utilization, U.S.

shipments, inventories, share of apparent U.S. consumption, number of workers, hours

worked, total wages paid, average hourly wages, worker productivity, capital

expenditure, R&D expenses, total net sales, gross profits, COGS, operating income, net

income, the ratio of gross profits to sales, the COGS/NS ratio and the ratio of operating

income to sales.  *Id.* at 49 - 52.  The Commission observed that the domestic industry

experienced increasing market share as demand fluctuated and as cumulated subject

imports increased in volume.  *Id.* at 52.

The Commission explicitly considered but did not accord weight to plaintiff's

argument during the investigations that the domestic industry should have gained more

market share in 2017 than it did.  *Views* at 52 - 53.  In rejecting this argument, the

Commission noted that there were numerous purchaser requests that the domestic

industry was unable or unwilling to fulfill.  *Id.* at 53.  The Commission determined,

therefore, that the low-priced subject imports in the market in 2017 did not "prevent[] the

domestic industry from increasing its output or market share materially that year."

*Views* at 53 - 54.

Plaintiff disputes both the Commission's selection of the period of investigation

as well as the Commission's assessment of the record evidence based on this POI.

*See* Pl. Br. at 36.  With respect to the former issue, plaintiff argues that the Commission

should have selected the 2014 to 2017 period to analyze impact and causation for the

final phase of the investigations, rather than the 2015 to 2017 period highlighted by the

Commission.  Pl. Br. at 36.

The Commission's selection of the POI was in accordance with law.  The Commission has broad discretion to choose the POI.  *See Nucor v. United States*, 414 F.3d 1331, 1337 (Fed. Cir. 2005) ("the Commission has broad discretion with respect to the period of investigation that it selects for purposes of making a material injury determination . . . because the statute 'does not expressly command the Commission to examine a particular period of time'") (internal quotation and citation omitted). Determining the appropriate period of investigation is within the discretion of the Commission.  *Steel Auth. of India, Ltd. v. United States*, 25 CIT 472, 477, 146 F. Supp. 2d 900, 906 - 07 (2001).

Moreover, plaintiff did not contest the selected POI in the draft questionnaires for the final phase of the investigation.  Recording of Oral Argument at 1:25:57 - 1:26:25. This Court has "'generally take[n] a strict view of the need [for parties] to exhaust [their] remedies by raising all arguments' in a timely fashion so that they may be appropriately addressed by the agency."  *See Consol. Fibers, Inc. v. United States*, 32 CIT 855, 860 - 62, 574 F. Supp. 2d 1371, 1379 (2008) (holding that plaintiff was not permitted to contest the manner in which the Commission collected data since plaintiff did not address the issue in its comments on the draft questionnaires).  *See also Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 28 CIT 627, 644, 342 F. Supp. 2d 1191, 1205 (2004) (citation omitted).  Based on the broad discretion that the Commission maintains to determine the POI as well as plaintiff's failure to raise the issue during the investigation, the Commission's choice of the POI is in accordance with law.

Plaintiff also argues that the Commission's findings using the 2015 to 2017 POI

disregarded the [[            ]] taken by domestic producers to generate output,

capacity utilization and profits in response to the competition brought by low-priced

subject imports, following the decline of nearly all trade and financial indicators from

2015 to 2016, and that 2014 financial data illustrate this point.  Pl. Br. at 36. Plaintiff

highlights specifically that [[


]].  *Id*. at 36 - 37.

Plaintiff further challenges the Commission's factual finding that the domestic

industry was unable to supply all demand during the POI.  Pl. Br. at 38.  Plaintiff argues

that the inability of the domestic industry to supply all demand does not compel a finding

that the industry was not materially injured.  *Id.*  Plaintiff explains that the supply

constraints were due to demand for the [[                                    ]] that the

domestic industry no longer supplied, an action taken specifically in response to subject

imports.  Pl. Br. at 39.  Plaintiff maintains that the Commission's emphasis on [[

]] throughout the POI was an improper

interpretation of the record.  Plaintiff argues that the decision [[

]] is not a normal business strategy and was related solely to the

substantial presence of low-priced subject imports in the market.  *Id.*

The Commission reasonably addressed these arguments.  In its *Views*, the

Commission found that the domestic industry's performance improved during the POI.

*Views* at 49.  The Commission found that improvements in the industry's performance

despite flat demand and increased subject imports supported the determination that the

cumulated subject imports did not have a significant adverse impact on the domestic

industry.  *Id.* at 49 - 51.  The Commission found that Chemours' decision to discontinue

production of certain unprofitable grades of PTFE was voluntary because Chemours

regularly [[                                                   ]] during the POI.  *Views* at 53 n.258.  The

Commission added that Chemours discontinued production of these products despite

having an economic incentive to increase sales as long as the marginal revenues

generated by the sales exceeded Chemours' marginal cost.  *Id.*[9]

Further, the Commission did not predicate its negative determinations on the

domestic industry's inability to supply all demand.  *See Views* at 55.  The supply

constraints merely lent support to the finding that supply difficulties did not prevent

domestic producers from increasing their output, market share and capacity utilization

materially in 2017.  *Id.* at 52 - 54.

For these reasons, the court concludes that the Commission's determination that

the domestic industry did not suffer material injury by reason of the subject imports was

supported by substantial evidence and in accordance with the law.

## V.  Threat

Section 771(7)(F) of the Tariff Act directs the Commission to determine whether

the U.S. industry is threatened with material injury by reason of the subject imports by

analyzing whether "further dumped or subsidized imports are imminent and whether

---

[9]   For example, Chemours was unable to supply dispersion PTFE [[
                  ]] in 2017.  *Views* at 53, n.258.

material injury by reason of imports would occur unless an order is issued or a

suspension agreement is accepted."  19 U.S.C. § 1677(7)(F)(ii).  The Tariff Act further

provides that any threat determination by the Commission is to be made on the basis

that the evidence shows that the threat of material injury is real and that actual injury is

imminent.  19 U.S.C. § 1677(7)(F)(ii).

The threat of material injury provisions of U.S. law set out the factors that the

Commission is required to consider:

(I) if a countervailable subsidy is involved, such information as may be
presented to it by the administering authority as to the nature of the subsidy
(particularly as to whether the countervailable subsidy is a subsidy
described in Article 3 or 6.1 of the Subsidies Agreement) and whether
imports of the subject merchandise are likely to increase,

(II) any existing unused production capacity or imminent, substantial
increase in production capacity in the exporting country indicating the
likelihood of substantially increased imports of the subject merchandise into
the United States, taking into account the availability of other export markets
to absorb any additional exports,

(III) a significant rate of increase of the volume or market penetration of
imports of the subject merchandise indicating the likelihood of substantially
increased imports,

(IV) whether imports of the subject merchandise are entering at prices that
are likely to have a significant depressing or suppressing effect on domestic
prices and are likely to increase demand for further imports,

(V) inventories of the subject merchandise,

(VI) the potential for product-shifting if production facilities in the foreign
country, which can be used to produce the subject merchandise, are
currently being used to produce other products,
…

(VIII) the actual and potential negative effects on the existing development
and production efforts of the domestic industry, including efforts to develop
a derivative or more advanced version of

the domestic like product, and

(IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).

19 U.S.C. § 1677(7)(F)(i).

In its *Views*, the Commission focused its threat analysis on likely increases in volume, likely future price effects and likely future impact.  *Views* at 58 - 62.  On likely volume, the Commission found that while "subject import volume and market share reached period peaks in 2017, these gains did not occur at the expense of the domestic industry."  *Id.* at 58.  According to the Commission, the record did not show a significant rate of increase of subject import volume during the POI; instead, import volume followed the same trends as demand.  *Id.*  Further, the Commission found that if subject import volume were to increase, the increase would likely come at the expense of nonsubject imports unless a change in conditions of competition took place.  *Id*. at 61 - 62.[10]  Finally, the Commission also considered a number of other factors, including U.S. and foreign inventories, home market and third country shipments from the subject countries and worldwide growth in demand relative to U.S. increases in demand.  *Id*. at

---

[10] The Commission also pointed to evidence in the record relating to what it calls plaintiff's "speculation that subject imports might increase at the domestic industry's expense after driving nonsubject imports from the U.S. market."  Def. Opp. Br. at 47. According to the Commission, the record does not support this speculation.  The Commission claims that not only did it reasonably find that subject import volume was unlikely to undergo an imminent, significant increase, *Views* at 58 - 61, the Commission also found that the market share of nonsubject imports as a percentage of all PTFE in the U.S. market in 2017 renders it highly unlikely that subject imports would imminently drive nonsubject imports out from the U.S. market.  *Id*. at 40.

59 - 60.  Based on all of these factors, the Commission found that there was no

likelihood of an imminent increase in volume that would support an affirmative threat

finding.  *Id.* at 59 - 61.

On price, the Commission determined that the record indicated "no likely

imminent change in conditions of competition which would likely change the lack of

causal relationship between significant volumes of low-priced subject imports and prices

of the domestic like product observed during the POI."  *Id.* at 61.  On likely impact, the

Commission found that its record did not indicate a probability that material injury by

reason of subject imports was imminent.  *Id.* at 62.

Plaintiff argues that the Commission's negative threat determination was not

supported by substantial evidence on the record.  Pl. Br. at 39-43.  Plaintiff bases these

contentions on arguments related to the Commission's assessment of the volume of the

subject imports during the POI as well as what plaintiff sees as likely increases due to

capacity, price trends during the POI and impact, arguing: "the increase in imports and

pervasive underselling, together with the Commission's findings regarding the

conditions of competition, are inconsistent with the negative threat determination."  Pl.

Br. at 39 - 41.

The Commission reasonably addressed all of these arguments in its

determination.  "In reaching a threat determination, the Commission is afforded

discretion in interpreting the data, and the court does not weigh the evidence."  *United*

*States Steel Group – a Unit of USX Corp. v. United States*, 18 CIT 1190, 1224, 873 F.

Supp. 673, 703 (1994).  "A record may support several acceptable alternatives… the

court may not substitute its view of the data for that of the Commission but may only

consider whether a challenged determination is supported by substantial evidence."

*Bando Chem. Indus. v. United States*, 16 CIT 133, 136, 787 F. Supp. 224, 226.

Because the Commission supported its findings with substantial evidence, the

court will not "reweigh the evidence or substitute its own judgment for that of the

agency." *Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272

(2004).  The statute directs the Commission to consider threat factors "as a whole" in

determining "whether further dumped or subsidized imports are imminent and whether

material injury by reason of imports would occur" unless an order is issued.  19 U.S.C. §

1677(7)(F)(ii).  In finding no threat of material injury, the Commission reasonably relied,

*inter alia*, on its volume and price findings.  *Views* at 62.  Affording the appropriate

discretion to the Commission to interpret these data, the court finds that the

Commission permissibly determined, on the basis of substantial evidence in the record,

that the domestic industry was not threatened with material injury by reason of subject

imports.

## CONCLUSION

Niccolò Machiavelli, in the 16th-century political treatise *The Prince*, declares

that, "If an injury has to be done to a man it should be so severe that his vengeance

need not be feared."[11]  Pursuant to this remand, it is not necessary that the Commission

meet such a high threshold for injury as was pronounced by Machiavelli.

---

[11] Niccolò Machiavelli, *The Prince* (1532).

However, for the reasons provided above, the Commission is directed to explain further its decision not to discount post-petition data, taking into account the increase in subject import prices in the final quarter of 2017.  The court, therefore, grants in part and denies in part Plaintiff's Motion for Judgment on the Agency Record and remands the *Final Determinations* to the Commission for further proceedings in accordance with this opinion.  The Commission, in its discretion, may collect additional evidence relevant to the remanded issue.  The Commission may also reconsider any aspect of the *Final Determinations* it relied upon or took into consideration in its prior findings on the remanded issue.

For the foregoing reasons, the Commission shall file its remand redetermination with the court within 90 days of the date of this decision.  The parties shall have 30 days after the date of filing of the remand determination to file comments on the remand determination.  Replies on the comments are due 15 days thereafter.

 /s/ Timothy M. Reif
Timothy M. Reif, Judge

Dated: May 6, 2020
       New York, New York